IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ANDRUS LOVE, | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 2:12-CV-682-WKW |
| | ) [WO] |
| MHM CORRECTIONAL SERVICES, INC., | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Andrus Love brings this action against his former employer, Defendant MHM Correctional Services, Inc., alleging sex and race discrimination and retaliation in violation of Title VII of the Civil Rights Act. Before the court is MHM's Motion for Summary Judgment (Doc. # 18). The motion has been fully briefed. (Docs. # 19, 21, 22, 23.) After considering the parties' arguments, the relevant law, and the evidence, the court finds that MHM's motion is due to be granted.

**I. JURISDICTION AND VENUE**

The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5(f)(3). The parties do not contest personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.*  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable factfinder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists. *Id.* at 324.

## III.  BACKGROUND

A.  <u>Mr. Love's Employment with MHM</u>

Defendant MHM Correctional Services, Inc. ("MHM") provides mental health services to incarcerated inmates onsite at correctional institutions.  Plaintiff

Andrus Love, a black male, worked for MHM as an Activity Technician ("AT") at Bullock County Correctional Facility ("the prison") from April 2005 until January 2012, when MHM fired him. His duties as an AT primarily involved working directly with groups of inmates to help them build skills through their participation in planned recreational and social activities. As an AT, Mr. Love worked on a team alongside a psychologist, a mental health professional ("MHP"), a nurse, and a correctional officer. MHM partnered an AT and an MHP together, and the AT and MHP employees were responsible for a certain caseload of inmate-patients. MHM also required ATs to work in inmates' dorms where the ATs conducted hygiene inspections, among other things.

Carolyn Mburu, an MHM site administrator, primarily supervised Mr. Love and all other ATs. One hour per week, Mr. Love also worked under Mary Helen Collins, another site administrator who no longer works for MHM. While working for MHM, Mr. Love obtained a master's degree from Troy University in Counseling and Psychology.

Mr. Love claims that at some point in 2007, Ms. Mburu designated him as Head AT, supervising other ATs.[1] (Docs. # 19-1 at 132; 22-20 at 2.) Mr. Love admits that the position was not posted or advertised (Doc. # 19-1 at 130–131), and

---

[1] This fact is disputed. MHM insists that there never has been a "Head AT" position at Bullock County Correctional Facility or any other site and that all ATs report only to their site administrator. Viewing the record in the light most favorable to Mr. Love, the court accepts Mr. Love's claim that Ms. Mburu gave him supervisory duties as Head AT while he maintained a typical AT's salary.

his designation as Head AT did not result in higher pay, but rather in additional supervisory duties.  Mr. Love describes the additional duties as "going to several meetings," participating in "trainings," "implementing scheduling," and "holding people accountable."  (Doc. # 19-1 at 131.)  Mr. Love says that Ms. Mburu promised him he would be compensated, in due time, for his performance of additional work, but that she never fulfilled that promise.

### B.     MHM's Alleged Race Discrimination

According to Mr. Love, MHM did not require Brandee Gould, the only white AT working for MHM at the prison, to work in the dorms because she was afraid of the environment and requested not to work there.  Ms. Gould identifies herself as Hispanic, not white, because her mother is Panamanian.  (Doc. # 19-1 at 247–48.)  Mr. Love maintains MHM treated Ms. Gould more favorably by giving her fewer responsibilities.  Contrary to his allegations, Ms. Gould and others represent that she regularly conducted hygiene checks in the inmates' dorms. (Doc. # 19-1 at 247.)  This factual dispute is also resolved in Mr. Love's favor.

### C.     MHM's Alleged Sex Discrimination

MHM formerly employed Danielle Rushing as an MHP who worked on the same team and served the same inmate-patients as Mr. Love.[2]  Ms. Rushing quit in

---

[2] The complaint identifies Ms. Rushing as a former *AT* working a *different* caseload than Mr. Love.  (Doc. # 1 at 3 ¶ 8.)  But Mr. Love's deposition testimony aligns with MHM's characterization that Ms. Rushing was an MHP with whom he shared cases.  (Doc. # 19-1 at 187–95.)

2011. Mr. Love claims that when Ms. Rushing left MHM, management redistributed her caseload to two different MHPs. Consequently, Mr. Love asserts, as far as AT duties were concerned, his former cases became the responsibility of Nicole Harris and Fluchia Brunson, the two ATs assigned to the two MHPs who inherited Ms. Rushing's MHP responsibilities. According to Mr. Love, this left him with no caseload for several months.[3] He avers that when Ms. Harris and Ms. Brunson refused to work the assigned cases, Ms. Mburu took no disciplinary actions against these women, but instead reassigned the cases to Mr. Love.

### D. MHM's Alleged Retaliation

Mr. Love alleges that he became frustrated by Ms. Mburu's unfulfilled promises and unfair treatment of him. He complained to MHM that Ms. Mburu had failed to ensure that Mr. Love was compensated for performing more work, and that Ms. Mburu would not relieve him of extra responsibilities for which he was not being paid. The complaint nebulously states that Mr. Love also "complained of work conditions and other matters." (Doc. # 1 at 4 ¶ 10.) The complaint, the opposition brief, and the evidence do not make it clear when Mr. Love first complained, to whom Mr. Love complained (Ms. Mburu? Higher authority figures?), or whether Mr. Love complained specifically of sex- or race-

---

[3] As Mr. Love puts it, "At that point, I was not responsible for the cases Ms. Rushing once served. Other activities were added to my workload, but I was no longer responsible for Ms. Rushing's old cases." (Doc. # 22-2 at 8.) MHM disputes this fact too and asserts that the AT-related needs for that caseload always remained Mr. Love's responsibility.

5

based discrimination. (*See* Docs. # 1 at 4–5, 7; Doc. # 19 at 10, 12–13, 19, 21, 24–25.) The record does indicate that Mr. Love objected to Ms. Mburu's reprimanding him in January and February 2011 for not conducting group activities with inmates as scheduled, and for reading the newspaper in his office during work hours. (Docs. # 19-1 at 276; 19-2 at 6, 92–93; 22-19 at 1.) Mr. Love requested and received a meeting in early March 2011 with Matt Weis, Regional Human Resources Business Partner, and Teresa Houser, Program Manager. Mr. Love recorded part of the meeting, and the recording demonstrates that he defended himself against the January and February disciplinary actions and complained about his difficulties working with Ms. Mburu.[4] MHM responded by conducting an investigation and talking to the other ATs in March 2011.

MHM reports that, when it questioned other employees about Mr. Love's allegations against Ms. Mburu, no one corroborated Mr. Love's complaints. Rather, numerous employees of both MHM and the prison consistently complained that Mr. Love disrespected Ms. Mburu specifically and most women generally, intimidated women physically and verbally, said and did unprofessional and sexually inappropriate things, and often made others' work difficult. The same employees have submitted their declarations emphasizing these complaints against

---

[4] The court has listened to the recording. At the start of the meeting, Mr. Love used the words "retaliation," "discrimination," and "harassment." Mr. Weis asked him to elaborate. Mr. Love discussed his difficulty working with Ms. Mburu, and he expressed his feeling that the January and February write-ups were not warranted. But there is no complaint on the recording that Ms. Mburu or anyone else at MHM treated him differently because of his sex or race.

6

Mr. Love. (*See, e.g.*, Docs. # 19-1 at 224–28; # 19-2 at 14–34.) Mr. Weis and Ms. Houser relayed their findings to Mr. Love and issued a "final written warning" to Mr. Love in April 2011 for his unprofessional behavior toward his coworkers.

In May 2011, Mr. Love filed a charge with the Equal Employment Opportunity Commission, claiming that MHM had subjected him to race discrimination, sex discrimination, and retaliation for engaging in protected activity – *i.e.*, complaining to MHM about Ms. Mburu's "mistreatment" of him, his "work conditions[,] and other matters." (Doc. #19-2 at 43.)[5] The charge cites as retaliation that Ms. Mburu wrote up Mr. Love in January 2011 and that MHM upper management gave him a written warning in April 2011 after hearing his coworkers' complaints about him. (Doc. #19-2 at 43.)

Almost four months after he filed his EEOC charge, in September 2011, MHM gave Mr. Love another "final written warning," after coworkers continued to complain about his unprofessional behavior. And after another female coworker reported that Mr. Love made unwelcome remarks with sexual overtones, MHM fired him on January 17, 2012. Mr. Weis explains that MHM terminated Mr. Love because "[i]t was clear," from his perspective, "that [Mr. Love] could not and would not be persuaded to stop the troublesome conduct that his co-workers deemed harassing" and that the harassment caused "some of his co-workers [to

---

[5] This is the point at which MHM claims that it was first aware that Mr. Love complained of race or sex discrimination.

become] fearful of him." (Doc. #19-1 at 7 ¶ 22.) Approximately six months later, in July 2012, Mr. Love filed another charge with the EEOC alleging, among other things, that MHM terminated him in retaliation for filing the May 2011 EEOC charge of discrimination.

**E.     This Lawsuit**

Mr. Love filed this lawsuit against MHM in August 2012 alleging Title VII sex discrimination, race discrimination, and retaliation.  One might assume that Mr. Love's termination – the ultimate adverse employment action – would be an essential component of his discrimination or retaliation claims.  But the only mention of Mr. Love's termination in his complaint is in the "Factual Background" section where Mr. Love alleges that he "was ultimately terminated by [MHM]." (Doc. # 1 at 3 ¶ 7.)  That is it.  The complaint offers no allegation that Mr. Love was terminated because of his race or sex, or in retaliation for his engagement in protected activity.  It just states, as a fact, that MHM eventually fired him.

Instead, the complaint alleges that Mr. Love was adversely affected by unlawful practices when: (1) MHM required Mr. Love to work on Ms. Harris's cases that she was not required to complete (Doc. # 1 at 5 ¶ 12); (2) MHM required him, but not Ms. Gould, to work with inmates in the dorms (Doc. # 6 ¶ 17–18); and (3) MHM "inundated [Mr. Love] with disciplinary actions and write-ups" in retaliation for his complaints about his mistreatment (Doc. # 1 at 7 ¶ 21).

## IV.  DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits employers from "discharg[ing] any individual, or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). It also prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." *Id.* at § 2000e-3(a).

Where, as here, there is no direct evidence of unlawful race- or sex-based discrimination or retaliation, the plaintiff typically must use the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to show indirect evidence of discrimination. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174, 1181 (11th Cir. 2010). Under the *McDonnell Douglas* framework, the plaintiff must first make a prima facie case of discrimination or retaliation. He makes a prima facie case of discrimination by demonstrating that: "(1) [he] is a member of a protected group; (2) [he] was qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) employment or disciplinary policies were differently applied to [him]." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012). Similarly, he makes a prima

facie case of retaliation under Title VII by showing that: "(1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). "[S]ummary judgment . . . is appropriate if [the plaintiff] fails to satisfy any one of the elements of a prima facie case." *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 (11th Cir. 1998).

But if the plaintiff makes his prima facie case of either discrimination or retaliation, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions." *Gate Gourmet*, 683 F.3d at 1255. And if the defendant proffers a nondiscriminatory reason, the burden returns to the plaintiff, who must show that the proffered reason is pretextual. *Id.* The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007). "[A] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (internal quotations and original emphasis omitted).

A.      **Mr. Love's Failure to Make a Prima Facie Case**

   1.   *No Adverse Employment Action as to Race- or Sex-Based Discrimination Claims*

MHM argues that Mr. Love has not suffered any adverse employment action to support a prima facie case of discrimination.  (Doc. # 19 at 23–26)  Mr. Love responds that he suffered adverse employment actions insofar as Ms. Mburu (1) required him to handle Ms. Harris and Ms. Brunson's cases, (2) required him to perform activities in the dorms that Ms. Gould did not have to do, and (3) gave him unwarranted write-ups and poor evaluations.  (Doc. # 21 at 18–20, 21–22.)

The Eleventh Circuit's opinion in *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232 (11th Cir. 2001) instructs thoroughly as to what constitutes an adverse employment action in the discrimination context.  In *Davis*, the court held that "to support a claim under Title VII's anti-discrimination clause the employer's action must impact the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way."  *Id.* at 1239 (internal quotations omitted).  The plaintiff must show that there has been a "serious and material change" in the terms, conditions, and privileges of his job.  *Id.*  The plaintiff's asserted economic impact "cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."  *Id.*  "Moreover, the [plaintiff]'s subjective view of the significance and adversity of the employer's action is not controlling; the employment action

11

must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

In *Davis*, the court disagreed with a plaintiff who argued that his changed work assignments constituted an adverse employment action. *Id.* at 1244. The court noted that other circuits have held that "changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes." *Id.* at 1244–45. The court explained that changed work assignments only give rise to Title VII claims "in unusual instances" where the changes are so substantial and material that they "alter the terms, conditions, or privileges of employment." *Id*. at 1245.

Assuming that MHM gave Mr. Love more work or less desirable work than other white and female ATs, Mr. Love does not claim to have worked more hours. So, even if Ms. Mburu unfairly saddled Mr. Love with a larger workload than his colleagues, the assignment of extra duties alone does not amount to an adverse employment action. *See Diaz v. AIG Marketing, Inc.*, 396 F. App'x 664, 667 (11th Cir. 2010) (citing *Davis*); *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 609 (11th Cir. 2008) (same). Similarly, because Ms. Mburu's less than favorable evaluations and other disciplinary write-ups did not cause Mr. Love to suffer "tangible job consequences" like "a loss in benefits, ineligibility for promotional opportunities, or more formal discipline," *Davis*, 245 F.3d at 1241, these job

performance critiques and memos are not, by themselves, actionable under Title VII.

But Mr. Love contends that he has made a connection between these slights and more tangible consequences. He asserts that because of the disciplinary actions against him, beginning in late 2010 or early 2011, MHM also denied him the opportunity to be promoted to an MHP position. (Doc. # 21 at 19–21.) He claims that MHM promised him the opportunity to apply for an MHP position upon completing his master's degree, if a vacant MHP position opened, and that he was "slated for" the next vacant MHP position, but that MHM blocked him from applying. (Docs. # 21 at 19, 23; # 22-2 at 5.) MHM replies that this is the first time Mr. Love has made a claim that MHM denied him a promotion, and that Mr. Love may not amend his complaint through his opposition brief at the summary judgment stage. (Doc. # 23 at 2–3.)

The allegation that Mr. Love was promised, but denied the opportunity to apply for, an MHP position because of MHM's unlawful discrimination or retaliation is conclusory in the complaint. (*See* Doc. # 1 at 2 ¶ 6 ("[Mr. Love] has been adversely affected by discrimination involving promotion . . . and other terms and conditions of employment."); Doc. # 1 at 4 ¶ 10 ("[Mr. Love] carried out [Ms. Mburu's] requested [supervisory] duties; however, [Mr. Love] was not compensated or promoted.").) There are no allegations in the complaint that MHM

promised Mr. Love that he could promote to an MHP position, at Bullock County or elsewhere. Further, there are no allegations in the complaint or in the opposition brief explaining how MHM blocked Mr. Love from applying for an MHP position, whether others were afforded the opportunity to apply, or whether MHM hired someone else instead.

Mr. Love cannot "amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) (citing *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *see also Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006) (refusing to consider allegations developed during discovery where plaintiff failed to amend his complaint). Moreover, "it goes without saying that the court is barred from amending a plaintiff's claim." *Miccosukee Tribe*, 716 F.3d at 559. [6] [7] [8]

---

[6] Even if Mr. Love demonstrated that he suffered an adverse employment action when MHM refused to promote him or allow him to apply for a promition to an MHP, Mr. Love would have to show that MHM filled an MHP position, for which Mr. Love was qualified, with a female or a non-black employee. *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005) ("[P]laintiff must demonstrate," among other things, that the employer filled the desired position "with an individual outside the protected class."). Mr. Love does not offer any evidence to further develop a prima facie case of discrimination-based non-promotion.

[7] Mr. Love also argues that MHM stripped him of his Head AT responsibilities and authority. This too is absent from his pleading. But assuming that Mr. Love was in fact the Head AT, a role for which Mr. Love concedes he was not paid differently (Doc. # 19-1 at 131), and assuming that MHM stripped him of Head AT responsibilities in 2011, he only lost a title, responsibilities, and prestige, but not pay or other benefits. Again, this deprivation, without a connection to more tangible consequences, is not actionable as an adverse employment action. *See Davis*, 245 F.3d at 1245.

Consequently, Mr. Love is left with his claims that MHM made him do more work than others and subjected him to disciplinary actions. These claims, whether considered individually or in combination with one another, are insufficient as a matter of law to constitute an adverse employment action, so Mr. Love fails to make a prima face case of sex or race discrimination.

### 2. *No Adverse Employment Action as to the Retaliation Claim*

MHM also argues that Mr. Love fails to show an adverse employment action in support of a prima facie case of retaliation. (Doc. # 19 at 31–32.) In the context of retaliation claims, the Supreme Court has interpreted "adverse employment action" more broadly than in the discrimination claim context. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–63 (2006). In evaluating the adverse employment action allegedly supporting a retaliation claim, the proper inquiry is whether an employer's actions are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. In the instant case, the "unwarranted write-ups" from supervisors and "documented biased complaints" from colleagues, (Doc. # 21 at 25) would not dissuade a reasonable employee from engaging in protected

---

[8] Termination is an adverse employment action, but, as discussed earlier, Mr. Love has not alleged a discriminatory termination claim or presented evidence that MHM's "employment or disciplinary policies were differently applied to" Mr. Love than to employees outside his protected class. *Gate Gourmet, Inc.*, 683 F.3d at 1255. In other words, Mr. Love has cited no evidence that MHM retained a white or female comparator who behaved as Mr. Love behaved toward her coworkers.

activity under Title VII. *See Burlington*, 548 U.S. at 57. Hence, Mr. Love fails to develop his prima facie case of retaliation by showing that he suffered an adverse employment action.[9] [10]

---

[9] At certain places in his opposition brief, Mr. Love posits that MHM terminated him in retaliation for reporting discrimination within MHM. (*See* Doc. # 21 at 13 (asserting that "Defendant [w]rongfully [t]erminated [Mr. Love]" as retaliation for reporting sex and race discrimination); Doc. # 21 at 25 (asserting that "[Mr. Love] was . . . ultimately terminated with a clear sign of retaliation solely due to [his] reports of in-house discrimination").) However, as noted earlier, Mr. Love's pleaded theory of MHM's liability is not premised upon an alleged wrongful termination. And lest there be any confusion whether Mr. Love's termination was one of the retaliatory acts of which Mr. Love has complained, MHM specifically asked Mr. Love if he was alleging that his termination was part of his retaliation claims. He said, "No." (Doc. # 19-1 at 200–01.) Even so, in the opposition brief, Mr. Love argues that MHM "wrongfully terminated" him. (Doc. # 21 at 13.) Again, Mr. Love cannot modify his claims at the summary judgment stage, *see Miccosukee Tribe*, 716 F.3d at 559, especially when the argument contradicts his sworn testimony.

[10] Additionally, MHM argues that Mr. Love cannot make the required causal connection between his engagement in protected activity and an actionable adverse employment action. (Doc. # 19 at 12–15.) The court agrees. Mr. Love points to no evidence that he complained to MHM of unlawful race or sex discrimination or retaliation prior to the filing of his first EEOC charge on May 11, 2011. Mr. Love cites his March 2011 meeting with Mr. Weis and Ms. Houser as a time in which he engaged in protected activity, (*see* Doc. # 21 at 24), but after reviewing the tape recording, it is clear that Mr. Love made no allegation at that time that MHM was discriminating against him on the basis of his sex or race. Thus, for purposes of the causation analysis, Mr. Love did not engage in protected activity until May 2011. After that point, MHM gave Mr. Love another final written warning in September 2011, almost four months later. Then, MHM terminated him in January 2012, more than seven months later.

A Title VII plaintiff can meet the burden of proving causation "by showing close temporal proximity between the statutorily protected activity and the adverse employment action. But mere temporal proximity, without more, must be very close. A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (internal citations and quotations omitted). Mr. Love presents no evidence of causation other than temporal proximity; however, based upon *Thomas*, neither a seven-month gap nor even a four-month gap between the protected activity and the adverse employment action will suffice to raise a genuine issue of material fact with respect to causation. Therefore, even if Mr. Love had demonstrated that he had suffered an adverse employment action, he would have failed to establish a prima facie case of retaliation based upon the absence of evidence of causation.

16

**B.     Mr. Love's Failure to Rebut MHM's Proffered Reasons as Pretext**

Assuming for the sake of argument that Mr. Love could make a prima facie case of sex discrimination, race discrimination, or retaliation on the basis of either his non-promotion or his termination, MHM would still be entitled to summary judgment.  MHM submits that Mr. Love's superiors warned him and counseled him repeatedly because they honestly believed that Mr. Love violated company policies and failed to perform his job duties.  Further, MHM contends that it fired Mr. Love because he continued to violate company policy in spite of MHM's repeated warnings.  (Docs. # 19 at 36–37; # 23 at 19–20.)

Mr. Love responds that MHM viewed him favorably and evaluated him favorably from 2006 to 2010, but began to unfavorably evaluate him and discipline him in 2011.  (Doc. # 21 at 23.)  He contends that MHM's sudden lack of love for Mr. Love can be explained only by MHM's intent to retaliate in response to his 2011 complaints of unlawful discrimination.  But this theory ignores that MHM has submitted undisputed evidence that it lacked awareness of Mr. Love's colleagues' complaints about his inappropriate behavior until early 2011.  (Doc. # 19-1 at 18–19.)  It also disregards Mr. Love's tarnished employment record prior to 2011.  (*See* Doc. # 19-1 at 259–62 (documenting 2005 counseling and "final written warning" for interpersonal conflict with co-worker); Doc. # 19-1 at 267–74 (documenting 2007 warnings for unexcused absences and leaving work early).

Mr. Love also relies on the affidavits of three current or former MHM employees who represent that Mr. Love was generally a good employee. Their favorable testimonies about his character do not raise inconsistencies or contradictions sufficient to create a genuine issue of material fact that discrimination or retaliation motivated MHM to take adverse action against Mr. Love. Moreover, none of the affiants had personal knowledge of the circumstances that led MHM to discipline and eventually fire Mr. Love. Aside from his 2006-2010 evaluations and character witnesses, Mr. Love only offers the court his own conclusory allegations. (*See, e.g.*, Doc. # 21 at 21, 23 ("After a careful review, it is clear that the real reason . . . was discrimination and retaliation.").) "Conclusory allegations . . . without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young v. Gen. Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988) (internal quotations and alterations omitted).

Thus, even if Mr. Love could support a prima facie case, he fails to rebut as pretext MHM's proffered non-discriminatory for disciplining and terminating him.

## V. CONCLUSION

MHM has demonstrated that there is no genuine dispute as to any material fact on Mr. Love's Title VII claims and that it is entitled to judgment as a matter of

law. Mr. Love has failed to show otherwise. Accordingly, it is ORDERED that MHM's motion for summary judgment (Doc. # 18) is GRANTED.

A separate final judgment will be issued.

DONE this 23rd day of September, 2013.

                                                /s/ W. Keith Watkins
                                    CHIEF UNITED STATES DISTRICT JUDGE